# Mukerji v. City of Reading Charter Review Board

*Steven K. Ludwig,* for petitioners.
*Eric B. Smith,* for respondent.

LASH, *J.,* March 26, 2007—The matters before this court are the petition of Adam Mukerji and City of Reading for review of the final order of the City of Reading Charter Board dated July 24, 2006, and a corresponding motion of the Charter Board to enforce said order.

The order of July 24, 2006 entered disposition of a complaint filed by a City of Reading resident, Cherlynn Martin, alleging a violation of section 706 of the City Charter by Mukerji. Specifically, the complaint claimed that Mukerji, holding the position of Director of Community Development for the city, was not a resident of Reading, thereby failing to comply with the residency requirement of section 706. An evidentiary hearing was held on June 28, 2006 before the Charter Board. The Charter Board found that Mukerji was not a resident of the city, that under the residency requirement of the charter he was required to be a resident during his tenure, and that he was not excused from this requirement by any actions of the mayor or city council, including the passages of ordinances, which, according to Mukerji, changed his employment status to one not subject to the residency requirement.

The Charter Board suspended Mukerji for a period of 30 days, providing that Mukerji must establish residency within the city within 120 days of the date of the order or be terminated. The Charter Board also imposed fines. Mukerji and the city challenge the order, claiming that the order violated the Home Rule Charter and Penn-

sylvania law in that, inter alia, it usurped the authority vested exclusively in city council and/or the mayor and violated ordinances adopted by the city council of Reading and approved by the mayor. The Charter Board seeks enforcement of its order. Argument was held before this court on March 19, 2007.

## I. BACKGROUND

On November 2, 1993, city voters implemented the "Home Rule Charter" with a "strong mayor-council form of government with a managing director" in order to "make the government of the City of Reading more responsive to the needs of the citizens of Reading. . . ." (Report and recommended Home Rule Charter for the City of Reading, July 1993, page VI.) The charter was enacted pursuant to the Home Rule Charter and Optional Plans Law (HRC and OPL), 53 Pa.C.S. §§2901-3171. The charter became effective in January 1996.

Section 706 of the Home Rule Charter established a residency requirement for department directors. That section provides:

"Section 706. Compensation of heads of departments, offices and agencies.

"The compensation of all heads of departments, offices and agencies under the direction of the mayor shall be proposed by the mayor and approved by ordinance. Compensation of all other employees shall be set in accordance with the uniform pay plan established by city council in the personnel code. All such heads of departments, offices and agencies need not be residents of the city at the time of appointment, but after appointment

shall reside in the city. City residency shall be required within 12 months of being appointed."

Pursuant to section 601 and section 703 of the charter, the city then enacted an Administrative Code and a Personnel Code. Section 1-207 of the Personnel Code established a residency requirement for all employees. That section states:

"Section 1-207. Residency.

"Section 706 of the charter stipulates the residency requirement for department directors. Section 401 of the charter stipulates residency requirement of the managing director. All employees hired by the City of Reading following the effective date of this Personnel Code shall become residents of the city within one year of date of hire and shall remain so during their period of employment with the city."

In 2003, Pennsylvania's Commonwealth Court was called upon to interpret the city charter relating to authority of the mayor, managing director and city council over non-exempt career service employees. In the case of *City Council of the City of Reading v. Eppihimer,* 835 A.2d 883 (Pa. Commw. 2003), the court found that the mayor and managing director, and not city council, possess exclusive administrative and executive authority over the appointment, promotion, transfer, demotion, suspension, dismissal or disciplinary action concerning non-exempt career service employees under the terms of the Home Rule Charter. The court also noted that the mayor carries his responsibility for employment of personnel through the managing director, who is the chief administrative officer of the city, pursuant to section 406 of the charter. Among other things, the managing director shall

"direct and supervise the administration of all departments, offices and agencies of the city, except as otherwise provided by this charter or by law." The Department of Community Development is one of the departments in the administrative service of the city reporting to the managing director.

In the November 2002 general election, the charter was amended through referendum, taking effect the first Monday of January 2003. Among other things, the amendment established an independent Charter Board consisting of five city residents. Amendment I, section 2.b, provides jurisdiction of the Charter Board, as follows:

"(b) Jurisdiction. The Charter Board shall hear and decide all cases alleging violations of the charter or administrative code, except that its jurisdiction shall not extend to any case arising under the Ethics Code or the Personnel Code. Insofar as permitted by state law the board shall issue binding opinions, impose penalties and administrative fines, refer cases for prosecution, and conduct investigations on its own initiative and on referral or complaint. City counsel shall appropriate sufficient funds to enable the board to perform the duties assigned to it, including expenses for independent counsel and other necessary staff."

Amendment I, section 2.c, required city council to, by ordinance, adopt regulations to implement the Charter Board. On or about July 25, 2005, city council enacted ordinance no. 46-2005, the Charter Board Ordinance. This ordinance granted powers to the Charter Board, including the power to hear and decide all complaints alleging violations of the charter and Administrative

Code,[1] to conduct investigations, to hold hearings, to adopt rules and regulations to administer, implement, enforce and interpret the ordinance, and to impose penalties and administrative fines, as well as to refer matters before it to other authorities with jurisdiction. Among the penalties available to the Charter Board under the ordinance are the powers to suspend or terminate[2] an employee, impose a fine, not to exceed $1,000 per violation, or impose an administrative fine of not more than $1,000 to defray the actual cost and expense of investigating a violation.[3]

## II. FACTS OF THE CASE

In March 2002, the city hired Mukerji for the position of Manager of Economic Development. Sometime during September or October 2002, the city named him director of "Community and Economic Development," an office created by the terms of the Administrative Code.[4] The office is subject to the residency requirements of section 706 of the Charter Code.

---

1. The Charter Board is precluded from hearing cases raised under the Ethics Code or the Personnel Code, in accordance with the terms of the charter.

2 Section V.B.2.a.ii.f. and g of the Charter Board Ordinance.

3. The termination provision, section V.B.2.a.ii.d, permits termination "in compliance with existing personnel practices, collective bargaining agreements and/or statutes, with notification to the respondent, the mayor, the managing director, the director of the department in which the respondent is employed, if any, and the complainant, if any."

4. Currently section 1-189. The office is known in the Administrative Code as Department of Community Development. The department is responsible for the preparation of short- and long-range planning, economic and community development programs, including recreation.

On January 6, 2006, Cherlynn Martin filed her complaint with the Charter Board alleging Mukerji was in violation of section 706 of the charter. The Charter Board held a hearing on June 28, 2006.

Immediately prior to the hearing, city council enacted two ordinances intended to change Mukerji's employment status as of June 15, 2006. Ordinance 46-2006 amended section 1-189 of the Administrative Code by eliminating the office of "Department of Community Development." In its place, a new section 1-189 was enacted which created the position of "Economic Development Manager," setting forth the office's qualifications and duties. The second ordinance, 47-2006, amended section 1-207 of the Personnel Code by deleting the language requiring residency for all employees governed by the Personnel Code. The enactment of these ordinances was a clear statement by the mayor and city council that the city desired the continuation of Mukerji's services, but recognized that so long as he was not a resident of the city and remained subject to section 706 of the charter, his employment status was in jeopardy. Accordingly, the ordinances provided an apparent method to modify Mukerji's employment status such that he would now fall under the authority of the Personnel Code, outside the jurisdiction of the Charter Board, engineering employment that no longer required residency in the city.

At the hearing, Mukerji admitted that he resides in North Wales, Montgomery County, Pennsylvania. He testified that he has never owned or leased property in the city.

Managing Director Ralph Leon Churchill Jr. agreed in his testimony that Mukerji was in violation of section

706 when he was the director of Community and Economic Development. However, as of June 15, 2006, based on the enactment of ordinances 46-2006 and 47-2006, Churchill believed that Mukerji was no longer subject to section 706 due to a change in his employment status. The current office held by Mukerji, the "Office of Economic Development," is part of the department of the managing director of which the managing director is the head. Mukerji is no longer the head of a department, office or agency, but is, in essence, one of many managers within the city's governmental structure overseen by the managing director. However, Mukerji's duties were much the same as his duties as director of Community and Economic Development. His salary has not changed and his office location remains the same. He did not consider the change a demotion.

At its meeting of July 11, 2006, the Charter Board held an executive session. At the conclusion of the session, the Charter Board took a public vote to adopt what would later become the Charter Board's opinion and order, voting 4 to 0 in favor of the opinion and order.[5] The Charter Board issued its opinion and order on July 24, 2006, finding Mukerji to be in violation of the residency requirement. The Charter Board specifically found that Mukerji's duties, salaries, responsibilities, office location and staff did not change when he became the city's Economic Development Manager. In fact, the enactment of ordinance 46-2006 had no substantive effect, as the original section 1-189 and the amended section 1-189 of the Administrative Code are virtually identical. Mukerji still remained the "head of the Office of Community

---

5. The fifth board seat was vacant.

Development" despite the change of title to manager. As manager, Mukerji continued to report to the managing director as he did as director of Community Development and continues to do so without any intervening level of supervision or accountability. His change of position is one of title and is not a demotion.[6]

Accordingly, the Charter Board publicly censored Mukerji and imposed an administrative fine of $1,000 and an additional fine of $1,000, suspended him from city employment without pay for 30 days commencing July 25, 2006, and required him to file an affidavit within 30 days of the date of the order affirming his intention to establish residency within the city within 120 days of the date of the order. The Charter Board further ordered that failure to submit the affidavit within the specified time would cause immediate termination of Mukerji's employment with the city. Likewise, if he failed to actually establish residency within the 120 days of the final order, that would also require immediate termination.

## III. QUESTIONS PRESENTED

In their petition for review, Mukerji and the city raise several issues, which can be boiled down to the following:

(1) Was the Charter Board's action in ordering the suspension and termination of Mukerji's employment contrary to law or the charter?

(2) Did the Charter Board abuse its discretion and violate law and/or the charter in imposing fines and costs totaling $2,000?

---

6. Final opinion and order, paragraphs 14-18.

(3) Was Mukerji denied a fair hearing because the Charter Board was not impartial and at least two Charter Board members should have been recused from the hearing?

(4) Is the Charter Board's decision void because the Charter Board never promulgated rules and regulations establishing the procedure and standards which it would utilize in imposing penalties or rules necessary for the conduct of its meetings?

## IV. DISCUSSION

Before turning to the substantive issues in this case, we will preliminarily address the matters of recusal and the absence of promulgated rules and regulations governing the proceeding.

Prior to the commencement of the hearing on June 28, 2006, Mukerji and the city moved for recusal of Charter Board members Susan Gibson and John Slifko. Counsel argued that Ms. Gibson had requested funds from the city and was rejected, and that Gibson stated that if her request were rejected she would get the funds one way or another. Counsel also claimed that Gibson's husband addressed city council regarding residency issues, setting forth that city council should enforce the terms of the current ordinances. Regarding Vice Chair Slifko, counsel argued that he is a party to a pending lawsuit against the city dating back to 2000 alleging Home Rule Charter violations.

After hearing argument, the Charter Board moved into executive session and returned, at which time, both Gibson and Slifko stated, on the record, that neither had any reason to believe that they could not hear the case im-

partially and without bias. At the conclusion of the hearing, the Charter Board denied the motion to disqualify based on Gibson's and Slifko's representations and because no evidence was placed on the record to support the allegations. The Charter Board now contends that the motion was without merit and was not timely.

We first address the timeliness. In *Goodheart v. Casey,* 523 Pa. 188, 199, 565 A.2d 757, 763 (1989), the Pennsylvania Supreme Court states: "The case law in this Commonwealth is clear and of long standing; it requires a party seeking recusal or disqualification to raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred."

The Charter Board argues that the matter was not timely because Mukerji was aware of his grounds for recusal prior to the hearing and should have raised it before commencement of the hearing. We disagree. The earliest the Charter Board members could have considered the recusal was at the time of the hearing, for that was the earliest opportunity for a record to be made. At the time of the motion, the record was made, with both supervisors declaring that they could be fair and impartial. While of course the motion could have been filed prior to the hearing, giving opposing counsel and the Charter Board members more notice, the timing did not affect the propriety of the proceedings. If either opposing counsel or the Charter Board members needed time to respond, postponement of the hearing could have been requested. Most importantly, the primary purpose for requiring a timely motion for recusal is to prevent a party from strategically withholding the motion while he determines whether the hearing is proceeding favorably to him. That concern was not present here.

We determine, however, that the recusal motion is without merit. The case of *Caln Nether Company L.P. v. Board of Supervisors of Thornbury Township,* 840 A.2d 484, 496 (Pa. Commw. 2004), stated the applicable law: "[D]ue process requires [the] local governing body in the performance of its quasi-judicial functions to avoid even the appearance of bias or impropriety. A showing of actual bias is unnecessary in order to assert a cognizable due process claim; the mere potential for bias or the appearance of non-objectivity may be sufficient to constitute a violation of that right."

The Commonwealth Court then went on to set forth that while an appearance of nonobjectivity is sufficient to trigger judicial scrutiny, the significant remedy of invalidation often depends on something more tangible. "Before it can be said that the [fact-finder] should have recused himself, the record must demonstrate bias, prejudice, capricious disbelief or prejudgment. . . . If a [fact-finder] thinks he is capable of hearing a case fairly, his decision not to withdraw will ordinarily be upheld on appeal." *Id.* (citation omitted) The Supreme Court in *Goodheart* also established that the fact-finder is the "most capable to determine those factors hidden in the recesses of the mind and soul which would bear upon his or her capability to maintain the impartiality that each matter must receive." 523 Pa. at 200, 565 A.2d at 763.

Here, as stated, both challenged Charter Board members expressed on the record their ability to decide the matter fairly. Additionally, the board members agreed to defer a final determination on recusal until the conclusion of the hearing to enable Mukerji and the city to develop a record supporting the motion. No evidence was produced providing a basis for the allegations claimed in

the motion. The record does not support recusal. The Charter Board's determination shall stand.

Petitioners also claim that the Charter Board failed to adopt rules and regulations to "administer, implement, enforce and interpret the Board Ordinance," as required by section III.A.6 of the Charter Board Ordinance.

This issue is a technical violation of the Charter Board Ordinance, which did not affect the proceedings. There is no mandatory requirement that a local agency implement specific procedures to govern a hearing prior to a hearing actually being held. In cases where there is no established procedure, the Local Agency Law is available to provide procedural due process protections for the enforcement of personal and property rights. *Boehm v. Board of Education of the School District of Pittsburgh,* 30 Pa. Commw. 468, 474, 373 A.2d 1372, 1375 (1977); *Fatscher v. Springfield School District,* 28 Pa. Commw. 170, 174, 367 A.2d 1130, 1132 (1977).

Mukerji received adequate due process protection. He received notice and an opportunity to be heard. His interests were represented by the city solicitor. Most importantly, he does not allege any violations of due process which would warrant review. Accordingly, this court denies Mukerji and the city relief on this basis.

We turn then to the main issues relating to the propriety of the Charter Board's actions. Preliminarily, we restate the general law applicable to the interpretation of the City's Home Rule Charter, as set forth by the Commonwealth Court in *Eppihimer, supra,* at pages 886-87 (footnote omitted):

"The issues must be addressed in the context of the City's Home Rule Charter, as it is the controlling docu-

ment in this case. The charter was enacted pursuant to the Home Rule Charter and Optional Plans Law (HRC & OPL), 53 Pa.C.S. §§2901-3171. Section 2961 of the HRC & OPL sets forth the powers granted to a municipality that has chosen to adopt a home rule charter, explaining that it 'may exercise any powers and perform any function not denied by the constitution of Pennsylvania, by statute or by its home rule charter.' 53 Pa.C.S. §2961. See also, Pa. Constitution, Article IX, Section 2; charter section 102 (incorporates this provision of the HRC & OPL). Therefore, a presumption exists that the exercise of power is valid if no restriction exists in the constitution, the charter itself, or the acts of the legislature. *Fraternal Order of Police, Fort Pitt Lodge No. 1 v. City of Pittsburgh,* 165 Pa. Commw. 83, 89, 644 A.2d 246, 249 (1994), *petition for allowance of appeal denied,* 544 Pa. 637, 675 A.2d 1253 (1996). However, regardless of this expanded autonomy, home rule municipalities must act according to the parameters set by the legislature in the HRC & OPL. *County of Delaware v. Township of Middletown,* 511 Pa. 66, 511 A.2d 811 (1986).

"In addition, this court has held that general rules of statutory construction are applicable in interpreting provisions of a home rule charter. *Williams v. City of Pittsburgh,* 109 Pa. Commw. 168, 173, 531 A.2d 42, 44 (1987) (citing *Cottone* v. *Kulis,* 74 Pa. Commw. 522, 460 A.2d 880 (1983)), *petition for allowance of appeal denied,* 518 Pa. 622, 541 A.2d 748 (1988). We must interpret statues to ascertain and effectuate the intent of the legislature and, if possible, give effect to all of its provisions. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. §1921(a). Further, if the words of a statute are clear and unambiguous, a court may not ignore

the letter of the law under the pretext of pursuing its spirit. 1 Pa.C.S. §1921(b); *Ramich v. Workers' Compensation Appeal Board (Schatz Electric Inc.),* 564 Pa. 656, 770 A.2d 318 (2001). This court must presume that the drafters of the charter did not intend a result which is absurd, impossible of execution or unreasonable. *Cottone,* 74 Pa. Commw. at 526, 460 A.2d at 882."

We also note preliminarily that no party has challenged the legality of the residency requirements, which we agree are valid and enforceable. In *City of Meadville, Firemen's Civil Service Commission v. Neff,* 69 Pa. Commw. 259, 263-64, 450 A.2d 1078, 1080 (1982) (footnote omitted), the court states:

"The validity of appropriately defined and uniformly applied residency requirements for municipal employees is well-established. *McCarthy v. Philadelphia Civil Service Commission,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed. 2d 366 (1976); *Nevitt v. Board of Supervisors of Logan Township,* 32 Pa. Commw. 474, 379 A.2d 1072 (1977). And, while a person may have more than one residence, he may have only one 'legal residence,' which . . . is properly construed to mean domicile. A determination of one's domicile is dependent on the facts of each individual case. *McCarthy v. Philadelphia Civil Service Commission,* 19 Pa. Commw. 383, 339 A.2d 634 (1975), *aff'd,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976)."

Residency requirements have also been upheld in the cases of *Viggiano v. Civil Service Commission of City of Philadelphia,* 74 Pa. Commw. 191, 459 A.2d 875 (1983), and *Civil Service Commission of City of Pittsburgh v. Parks,* 80 Pa. Commw. 134, 471 A.2d 154 (1984).

Turning then to the merits, we address first the imposition of fines. After determining Mukerji was in violation of section 706 of the charter, the Charter Board imposed a fine of $1,000 and also imposed an administrative fine of $1,000.[7] Petitioners argue that Pennsylvania law precludes fines in excess of $1,000. Additionally, petitioners urge that the maximum fine should not have been imposed because the evidence did not support imposing a maximum and because the Charter Board did not provide sufficient reasoning for its decision.

Amendment I, section 2.b, confers upon the Charter Board the power to "impose penalties and administrative fines." Section V.B.2.a.ii.f of the Charter Board ordinance permits the Charter Board to impose a fine not to exceed $1,000 per violation. Section V.B.2.a.ii.g permits the Charter Board to impose an additional administrative fine of not more than $1,000.

Petitioners believe that the Charter Board Ordinance violates section 41303(2.2) of the Optional Third Class City Charter Law,[8] which limits penalties for violation of a city ordinance to a fine not exceeding $1,000 or a term of imprisonment not exceeding 90 days, or both.

We disagree. The HRC and OPL, which governs adoption of Home Rule Charters, does not provide a limitation on the assessment of fines. Further, the HRC and OPL provides that another statute of the Commonwealth will only limit Home Rule Government authority when that

---

7. In its opinion and order, the board explained the administrative fine, stating: "The purpose of the administrative fine is to defray a fraction of the actual cost and expense incurred by the city in investigating, considering and deciding this violation."

8. 53 P.S. §41303(2).

statute is a "statute of general application." Section 2962(e)[9] provides:

"Statutes of general application—statutes that are uniform and applicable in every part of this Commonwealth shall remain in effect and shall not be changed or modified by this subpart. Statutes shall supersede any municipal ordinance or resolution on the same subject."

Under this provision, for the Optional Third Class City Charter Law to govern imposition of fines, it would have to be a statute that impacts on every part of this Commonwealth. This is clearly not the case since the statute is written for third class cities only. See *Wecht v. Roddey,* 815 A.2d 1146, 1152 (Pa. Commw. 2002). Accordingly, neither the charter nor the Charter Board Ordinance is limited by the Optional Third Class City Charter Law.

We find the fines to be appropriate. The evidence presented sufficiently established a violation. Mukerji was the director of Community Development, at least until June 15, 2006. At all times, he was a non-resident. The evidence is clear that, at a minimum, Mukerji was in violation of the charter from the filing of the complaint through June 15, 2006. We also determine that the Charter Board presented sufficient findings and reasoning in the opinion and order to justify its decision. The fact that the Charter Board may not have produced an analysis of all factors the Charter Board Ordinance requires to be considered is not fatal. Mukerji was adequately apprised of the ruling and the bases for same.

---

9. 53 Pa.C.S. §296.2(e).

The remaining issue concerns the Charter Board's decision to suspend, and then terminate Mukerji. Petitioners claim that the Charter Board went beyond its authority under the charter when it suspended and ter-. minated Mukerji, the Charter Board Ordinance notwithstanding.

Under the terms of the charter, the mayor and managing director possess exclusive administrative and executive authority on the appointment, suspension or removal of city employees. Section 603 of the charter confers upon the mayor the power to appoint or remove the head of any department, office or agency, subject to confirmation or inaction by city council. These duties are handled through the managing director, the chief administrative officer of the city, charged with directing and supervising the administration of all the departments, with the power to suspend or remove any city employee except as otherwise provided by the charter or by law under section 406. Similarly, the mayor and managing director possess administrative and executive authority over Reading's personnel system, which governs the appointment, promotion, transfer, demotion, suspension, dismissal or disciplinary action of the non-exempt career employees. See *Eppihimer, supra.*

The charter grants no authority to the Charter Board to suspend or terminate an employee. The rationale of the Commonwealth Court in *Eppihimer* applies here. The mayor and managing director are the only entities permitted, under the charter, to suspend or fire Mukerji for violation of the charter or for any reason.

We find, therefore, that the Charter Board went beyond the scope of its authority when it made findings and

recommendations regarding suspension and termination of Mukerji. We additionally find that V.B.2.a.ii.c and d of the Charter Board Ordinance relating to the power of the Charter Board to suspend or terminate an employee are unenforceable.

The process taken is also procedurally defective. Since the mayor and the managing director are the only ones with authority to suspend or terminate an employee, they would have to be included in any proceeding where such relief is sought. Each would have to be named as a party to the action and would have to be afforded due process, including notice and an opportunity to be heard. Here, neither the mayor nor the managing director were parties in the hearing before the Charter Board, nor were named in the motion of the Charter Board to enforce its order.

The appropriate method is an action in mandamus. Mandamus is available to compel performance of a ministerial, mandatory duty of a public official where there is clear legal right to performance and no adequate legal remedy. *Borger v. Pleasant Valley School District,* 122 Pa. Commw. 187, 189, 551 A.2d 648, 649 (1988). The purpose of mandamus is not to establish legal rights but to enforce those rights which are already established. *Waters v. Commonwealth of Pennsylvania, Department of Corrections,* 97 Pa. Commw. 283, 288, 509 A.2d 430, 432 (1986).

We enter the following order:

## ORDER

And now, March 26, 2007, upon consideration of the petition of Adam Mukerji and the City of Reading for

review of the final order of the City of Reading Charter Board dated July 24, 2006, the corresponding motion of the Charter Board to enforce the order of July 24, 2006, responses, briefs filed by the parties, review of the record, and after argument held, it is ruled that the order dated July 24, 2006 is valid and enforceable on the imposition of the $2,000 in penalties and administrative fines against Adam Mukerji for violation of section 706 of the City Charter. The rulings set forth in the order regarding suspension and prospective termination of Adam Mukerji's employment are deemed invalid and unenforceable.